Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CANFIELD SCIENTIFIC, INC., | |
| *Plaintiff,* | Civil Action No. 16-4636 |
| v. | |
| MELANOSCAN, LLC AND DR. RHETT DRUGGE, | **OPINION** |
| *Defendants.* | |

**John Michael Vazquez, U.S.D.J.**

The present matter comes before the Court on the motion of Defendants Melanoscan, LLC ("Melanoscan") and Dr. Rhett Drugge (collectively, "Defendants") to dismiss Counts Two through Five of the Complaint for failure to state a claim. Plaintiff Canfield Scientific, Inc. ("Canfield" or "Plaintiff") opposes the motion.[1] This case concerns allegations that Defendants sent correspondence to certain members of the dermatological community accusing Plaintiff of infringing on Defendants' patent. This motion was decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. The Court has considered the parties' submissions and grants in part and denies in part Defendants' motion. Defendants' motion is granted as to Counts Two and Four and those Counts are dismissed without prejudice. The motion is also granted as to the allegations concerning the two July 15, 2016 letters (the "July 15

---

[1] Defendants' brief in support of its motion to dismiss the Complaint will be referred to hereinafter as "Def. Br." (D.E. 15); Plaintiff's opposition to Defendants' motion to dismiss will be referred to "Pl. Opp'n" (D.E. 16); and Defendants' reply brief in further support of its motion will be referred to hereinafter as "Def. R.Br." (D.E. 19).

Letters") in Counts Three and Five and those allegations are likewise dismissed without prejudice. As to the June 18, 2016 email (the "June 18 Email") allegations in Counts Three and Five, the motion is denied and those counts shall remain with respect to the June 18 Email only.

## I. BACKGROUND[2] & PROCEDURAL HISTORY

Defendant Melanoscan is the owner of Patent No. 7,359,748 ("the '748 Patent"), titled "Apparatus for Total Immersion Photography." Compl. ¶ 11. Defendant Drugge is the inventor of the '748 patent and the founder of Melanoscan. *Id*. ¶ 4. The '748 Patent "relates to the detection, diagnosis and treatment of skin cancer." Def. Br. Ex. 1. Specifically, the whole-body photographic imaging system was "a substantial advancement in improving public health by automating the imaging of potentially cancerous lesions in a more rapid and complete method." *Id*.

Canfield is "a global leader in imaging systems, services, and products for scientific research and healthcare applications." Compl. ¶ 2. Among its products, Canfield develops, manufactures, and sells an imaging system called Vectra WB360. *Id*. ¶ 13. Canfield's customers for Vectra WB360 include Memorial Sloan Kettering Cancer Center ("MSK") in the United States and Princess Alexandria Hospital ("PAH") in Australia. *Id*. Dr. Drugge learned that MSK was using an imaging system that he believed violated the '748 patent. As a result, he sent the June 18 Email to Drs. Ash Marghoob and Allan Halpern of MSK and other "Friends and Colleagues,"

---

[2] The facts are derived from Plaintiff's Complaint (D.E. 1) ("Compl.") as well as the exhibits attached to Defendants' motion to dismiss (D.E. 15.4-15.7). When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a court may consider "documents which are attached to or submitted with the complaint" as well as "documents that the defendant attaches to the motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim." *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A)*, 768 F.3d 284, 290-91 (3d Cir. 2014). The exhibits relied on are the June 16 Email and the July 17 Letters.

which consisted of doctors and institutions in the dermatological field. *Id.* ¶¶ 15-17 (listing numerous doctors and institutions to whom the June 18 Email was sent). The June 18 Email in relevant part stated the following:

> Sloan Kettering's scanner pictured in the attachment to this email is violating the intellectual property behind by [sic] dear Melanoscan, Total Immersion Photography . . . This clear violation of my property rights is a sad reflection on the moral basis of leadership of Sloan Kettering . . . I find it profoundly disgraceful that this act of intellectual property theft has occurred within our community. . . I think that you should cease immediately in your use of my device as it violates my patent.

Def. Br. Ex. 2.

Although the June 18 Email does not mention Canfield or its product, Canfield alleges that the scanner in the attachment was its Vectra WB360. In addition, prior to the June 18 Email, "[MSK] ha[d] issued a purchase order for a Vectra WB360 to be built at Canfield's facility in New Jersey and for delivery and installation at [MSK's] facility in Basking Ridge, New Jersey." *Id.* ¶ 20. The Complaint does not indicate whether MSK actually went forward with the purchase. Similarly, if the purchase did not occur, the Complaint is silent as to why it did not.

Subsequently, on July 15, 2016, Mark D. Giarrantana, an attorney for Defendant Melanoscan, sent the July 15 Letters to Canfield and PAH, respectively, accusing Canfield of infringing the '748 Patent and requesting that PAH to refrain from obtaining "any further VECTRA Whole Body 360 'total body imaging' or like systems from Canfield" (the "July 15 Letters"). *Id.* ¶¶ 21, 22; Def. Br. Exs. 3 & 4. Plaintiff contends that "the statements and representations made by Dr. Drugge and Mr. Giarrantana are false, objectively baseless, were made in bad faith, and were intended to injure Canfield's relationships with its actual and prospective customers, and its business and reputation." Compl. ¶ 25.

Based on the June 18 Email and the July 15 Letters, Plaintiff filed its Complaint on August 1, 2016. D.E. 1. The Complaint alleges five causes of action: (1) Declaratory Judgement of Non-Infringement of the '748 Patent as to Melanoscan only;[3] (2) Tortious Interference with Contractual and Prospective Business Advantage; (3) Unfair Competition under the Lanham Act § 43(a) – 15 U.S.C. § 1125(a); (4) Commercial Disparagement under New Jersey Common Law; and (5) Unfair Competition under New Jersey Common Law. *Id.* In lieu of answering, Defendants moved to dismiss Counts Two through Five of the Complaint, D.E. 15, which Plaintiff opposed, D.E. 16.

## II. STANDARD OF REVIEW[4]

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is facially plausible when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has

---

[3] Each of the other Counts (two through five) is asserted against all Defendants.

[4] The Court notes that in Plaintiff's opposition it spends two and one-half pages discussing the pleading standard for a motion to dismiss, but fails to mention the key requirement that a complaint must be "plausibly pled." *Compare* Pl. Opp'n at 2-4 *with Twombly*, 550 U.S. 570 (requiring allegations to be ***plausibly pled***). Instead, Plaintiff discusses the "fair notice" standard and describes the Supreme Court's ruling in *Twombly* as having "expressly left much of the existing pleading standards intact." Pl. Opp'n at 3. This is not an accurate recitation of the current pleading standard under Rule 8. *See Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 895 (E.D. Pa. 2011) (noting that the Supreme Court's decisions in *Twombly* and *Iqbal* "have caused a *sea change* in the pleading practices in federal court.") (emphasis added).

acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). Plaintiff's plausible allegations must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

### III. DISCUSSION

The June 18 Email and the July 15 Letters form the factual predicate for Counts Two through Five. The Court will first review the email and two letters before turning to the actual counts.

First, the June 18 Email was sent by Dr. Drugge to a number of hospitals and practitioners, accusing MSK of infringing on his device. Def. Br. Ex. 2. Nowhere in the email does Dr. Drugge mention Canfield nor does he mention the Vectra WB360 or any other Canfield product. Additionally, he implies (if not outright claims) that MSK, not Canfield, stole his product. Specifically, as to Drs. Marghoob and Halpern of MSK, Dr. Drugge states: "You seek to be the inventors? Clearly you are the copycats." *Id.* at 2. A reasonable interpretation of this statement is that Dr. Drugge believed it was MSK (through Dr. Marghoob and Dr. Halpern) who had copied his device at the time he wrote the June 18 Email.

This interpretation is buttressed by other statements made in the email. Dr. Drugge indicates that "*Sloan Kettering's* scanner pictured in the attachment to this email is violating the

intellectual property behind my dear Melanoscan™, Total Immersion Photography." *Id.* at 1. (emphasis added). Drugge goes on to state that "*Halpern* and *Marghoob* [] both visited and inspected the Melanoscan in person." *Id.* (emphases added). Drugge then adds, "Allan (Halpern) and Ash (Marghoob) why have you chosen to work in the shadows of collegiality through illegal infringement of my patent? Think of how much further down the field we should have been for our patients sake had you chosen to collaborate 10 years ago? . . . Is it that you need more reputation?" *Id.* at 1-2. Again, the reasonable conclusion is that Dr. Drugge believes that the two MSK physicians improperly used his patented work because both had seen a form of the product a decade before. Dr. Drugge posits that the two physicians should have been working in conjunction with him to develop a better product.

Plaintiff claims that Dr. Drugge was referring to it when he mentioned "commercial forces" behind MSK's Dermatology Department. Pl. Opp'n at 16. While Plaintiff's conclusion is possible, it is not plausible. Dr. Drugge later explains in the email that MSK is working with "IBM . . . to exploit your dataset." Def. Br. Ex. 2. at 2. The only commercial force mentioned, besides the inherent profit motive in conducting such tests, is IBM. Canfield finally argues that given that the July 17 Letters reference their product; the June 16 Email was also referencing the Vectra WB360. Pl. Opp'n at 14-15. The laws of physics, however, betray this argument. If the attorney's letters had preceded the email, then a reasonable and logical inference certainly would be that Dr. Drugge knew of both Canfield and its product when he wrote the email. But since the letters were written a month *after* the email, the same reasonable inference is not available, absent a time machine.

In sum, while it is *possible* that Dr. Drugge knew that MSK was using Canfield's product when he wrote the June 18 Email, it is not a *plausible* conclusion to draw based solely on the

contents of the email itself. And Canfield relies solely on the email to support its contention that

Dr. Drugge knew of, and was referring to, the Vectra WB360 when he wrote the email. Canfield

therefore fails to plausibly plead that Dr. Drugge was referring to Canfield is his June 18 Email.

*See Twombly*, 550 U.S. 570.[5] To properly plead such a claim, Canfield will need to allege

additional facts demonstrating that Dr. Drugge was aware that MSK was using Canfield's product

when he sent the July 18 Email.

Turning to the July 15 Letters, the first letter was sent from Defendants' attorney to

Plaintiff. While Plaintiff refers to the "July 15 Letters" as plural, it does not provide any analysis

as to how a letter from Melanoscan's attorney to Plaintiff could support its claims. Additionally,

as Defendants point out, Canfield does not dispute Defendants' argument that this letter cannot

form the bases of Counts Three and Five. *See* Def. R.Br. at 13 n.5. Therefore, the Court will not

consider this letter in its analysis.

The second July 15 letter (the "July 15 PAH Letter") was sent from Defendants' attorney

to PAH, a customer of Canfield's. Plaintiff has provided the Court no case law in which a

notice/warning letter from an attorney supports Canfield's claims. Nonetheless, the Court will

analyze the following claims in regards to the June 18 Email and the July 15 PAH Letter.

---

[5] Plaintiff takes great liberty in its Complaint with respect to the content of the June 18 Email. When quoting from the email in its Complaint, Plaintiff selectively quotes, resulting in the implication that Dr. Drugge directly referred to Canfield's Vectra WB360. *See* Compl. ¶¶ 18-20. For example, Plaintiff states that "Dr. Drugge expresses his intent to 'publically serve notice throughout the dermatology community' that the Canfield Vectra WB360 in use at Sloan Kettering 'is violating the intellectual property' behind his '748 patent." *Id.* ¶ 18 (quoting June 18 Email). This allegation, however, is not supported by the actual content of the email itself. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.").

Count Two – Tortious Interference

In Count Two, Plaintiff brings a claim for tortious interference with contractual and prospective business advantage. Compl. ¶¶ 33-39. Specifically, Plaintiff alleges that "Canfield has customer relationships with Memorial Sloan Kettering Cancer Center in New York and Princess Alexandria Hospital in Australia." *Id.* ¶ 34. Additionally, Plaintiff has "further prospective business relationships with those customers and with many individuals copied on Dr. Drugge's 'public announcement' accusing Canfield's products of infringement." *Id.* Plaintiff states that Defendants, knowing of these relationships, "intentionally and without justification interfered with Canfield's current and prospective business relationships by making objectively baseless, bad faith allegations of patent infringement against Canfield." *Id.* ¶ 37. These allegations against Canfield, caused "Canfield's reputation and current and prospective business relationships [to be] irreparably harmed." *Id.* ¶ 39.

Defendants argue that Plaintiff has not alleged that Defendants' actions caused Canfield to lose any reasonably anticipated economic benefit. Defendants continue that Canfield has not plausibly pled that it suffered any damages. Def Br. at 9. Plaintiff responds that it stated each of the elements for a claim of tortious interference, including that Canfield anticipated delivering four devices to MSK, however "Defendants' interference with Canfield's relationship with Sloan Kettering intervened." Pl. Opp'n at 5.

To prevail on a claim for tortious interference, a plaintiff must plead "'[1] that it had a reasonable expectation of an economic advantage, [2] which was lost as a direct result of [defendants'] malicious interference, and [3] that it suffered losses thereby.'" *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016) (quoting *Ideal Dairy Farms, Inc. v. Farmland*

*Dairy Farms, Inc.*, 282 N.J. Super. 140, 198-99 (App. Div. 1995)).[6] "New Jersey recognizes that the tortious interference with prospective economic benefit or advantage cause of action is separate and distinct from tortious interference with an existing contract." *Galicki v. New Jersey*, No. 14-169, 2016 WL 4950995, at *31 (D.N.J. Sept. 15, 2016). "The primary difference between these two related torts is the existence of a contract, rather than merely a reasonable expectation of an agreement." *Id*. Thus, to plead a claim for interference with *prospective* contractual relations, a claimant must demonstrate a "reasonable probability" of a prospective, rather than actual, contractual relation. *Read v. Profeta*, No. 15-2637, 2017 WL 123438, at *7 (D.N.J. Jan. 11, 2017).

In order to plead that Plaintiff had a reasonable expectation that was interfered with, Plaintiff "must allege facts that show an existing or prospective economic or contractual relationship." *Advanced Oral Techs., L.L.C. v. Nutres Research, Inc.*, No. 10-5303, 2011 WL 198029, at *9 (D.N.J. Jan. 20, 2011). The "mere allegation of lost business does not suffice." *Id*. "At a minimum, a plaintiff must [] at least allege specific prospective contracts that were interfered with." *Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*, No. 07-5945, 2008 WL 4911868, at *7 (D.N.J. Nov. 13, 2008) (internal quotation marks omitted). Put another way, a party is required to plead that "if there had been no interference, there was a reasonable probability that it would have received the anticipated economic benefits." *Ideal Dairy Farms*, 90 F.3d at 747.

In the instant action, Plaintiff fails to plausibly allege what business or client (or prospective transaction) was lost as a result of Defendants' alleged interference. Plaintiff's Complaint is comprised largely of conclusory allegations that "Defendants . . . interfered with

---

[6] Defendants allege that this tort requires five elements, however the Third Circuit has recently reduced it to three. *Id*. at 382 n. 26. The substance of the elements has not materially changed, so the same analysis applies.

Canfield's current and prospective business relationships." Compl. ¶ 37. The Complaint indicates that "[MSK] has issued a purchase order for a Vectra WB360 to be built at Canfield's facility in New Jersey and for delivery and installation at [MSK's] facility in Basking Ridge, New Jersey." *Id*. ¶ 20. However, Plaintiff fails to plead that MSK did not go through with this order, or that MSK (or any other customer) have since refused to do business with Canfield. Moreover, to the extent the transaction did not take place, Canfield fails to plead whether it was a result of Defendants' alleged tortious actions. The Complaint is similarly silent as to any lost business with PAH.

Plaintiff additionally pleads that the June 18 Email was sent to "numerous prospective customers of Canfield." *Id*. ¶ 17. However, merely listing the names of those to whom the June 18 Email was sent does not sufficiently plead that Plaintiff lost any of the recipient's potential business as a result. *See IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *9 (D.N.J. Sept. 13, 2012) ("While [p]laintiffs allege numerous instances where [d]efendants interfered with [p]laintiffs' alleged existing contracts, [p]laintiffs fail to allege that this interference resulted in the loss of a contract or prospective gain."). To this end, Plaintiff also fails to plausibly plead that there was a reasonable probability that it would enter into a future business relation with any of the listed persons or institutions.

The allegations are not sufficient to plead that Defendants caused Canfield to lose any current or anticipated economic benefit. *See Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009) (affirming district court's dismissal of plaintiff's tortious interference claim when the "complaint fail[ed] to identify a single, specific customer that [plaintiff] either lost or could have acquired but for [defendants'] conduct"); *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. 13-6194, 2014 WL 1767471, at *5 (D.N.J. May

1, 2014) (dismissing a tortious interference counterclaim when "[d]efendant fail[ed] to identify any actual contract or customer affected by [p]laintiff's alleged misconduct."); *Lucas Indus., Inc. v. Kendiesel, Inc.*, No. 93-4480, 1995 WL 350050, at *9 (D.N.J. June 9, 1995) (granting motion to dismiss where counter-claimant failed to identify "a single customer or a single contract that [] was likely to consummate, but failed to consummate, due to the actions taken by [counter-claim defendant]").[7]

For the same reasons, Plaintiff has not plausibly pled the necessary damages. "Economic damages are a substantive element of a tortious interference claim." *Graco Inc. v. PMC Global, Inc.*, No. 08-1304, 2012 WL 762448, at *17 (D.N.J. Mar. 6, 2012); *see also N.J. Physicians United*

---

[7] Plaintiff cites to *Teva Pharma Indus., Ltd v. Apotex, Inc.*, No. 07-5514, 2008 WL 3413862 (D.N.J. 2008). There, the court denied the defendant's motion to dismiss where the plaintiff alleged that it had a "continuing, economically advantageous relationship with the supply of carvedilol for use in its carvedilol products" and defendant "knowingly interfered with this relationship by filing lawsuits for the purpose of barring others from beginning or continuing to supply carvedilol." *Id.* at *9. Thus, the plaintiff alleged that the defendant's actions restricted its ability to make and sell its products. The *Teva* Court noted decisions in this district that "[do] not require a party to identify a specific prospective customer or contract." *Id.* (citing two other cases in this District). The cited cases do seem somewhat at odds with the majority of opinions previously cited. *See, e.g., Aleynikov v. Goldman Sachs Grp., Inc.*, No. 12-5994, 2016 WL 6440122, at *17 & n. 20 (D.N.J. Oct. 28, 2016) (dismissing, based on New Jersey precedent, a claim for tortious interference with prospective economic damage for failing to plausibly plead that defendant knew of the plaintiff's relationship with a third party and due to the plaintiff's failure to offer facts that it had some reasonable expectation of financial advantage, while also acknowledging that *Teva* and a few other cases did not require that the specific third party be named). Nonetheless, they are distinguishable, since in those cases, the plaintiff alleged with some particularity the nature of the economic benefit that plaintiff was wrongfully denied, and that defendant knew of the benefit. Here, it is unclear that there has been *any* effect on Plaintiff's contracts, relationships with its customers, or prospective relationships. Additionally, as discussed, the Complaint does not plausibly plead that Dr. Drugge knew that MSK was using Canfield's product when he sent the June 18 Email. Thus, the Court finds *Teva* inapposite. Moreover, in *Teva*, the defendant did not argue that the complaint failed to allege a specific relationship with a third party, but instead asserted that the complaint did not provide sufficient notice of the charges. *Teva Pharma Indus.*, 2008 WL 3413862 at *9. The court in *Teva* merely concluded that the complaint placed the defendant on "fair notice of the claim and the grounds on which it was based." *Id.* (citation omitted).

*Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 310 (D.N.J. 2015). As stated, Plaintiff has not alleged that it lost any sale, any customer, or any potential customer as a result of Defendants' actions. Instead, the Complaint states in conclusory fashion that "Canfield's reputation and current and prospective business relationships have been irreparably harmed by Defendants' tortious conduct." Compl. ¶ 39. Such allegations, without factual support, are not sufficient to plead damages. *Interlink Prod. Int'l, Inc. v. HDS Trading Corp., Inc.*, No. 15-1642, 2015 WL 12840378, at *5 (D.N.J. Oct. 14, 2015) (dismissing a tortious interference claim when plaintiff only asserted conclusory allegations); *Bartone v. NetJets, Inc.*, No. 11-8, 2011 WL 2532497, at *7 (D.N.J. June 24, 2011) (dismissing a tortious interference claim where the complaint lacked the factual support necessary for damages). Therefore, as pled, the Complaint does not plausibly state a claim for tortious interference with current or prospective business interests.

Additionally, Defendants argue that Count Two should be dismissed with respect to Dr. Drugge since Canfield failed to plausibly allege that he knew of any relationship between Canfield and MSK when he sent the June 18 Email. Def. Br. at 13-18. The Court agrees for the reasons discussed above. Tortious interference requires Plaintiff to plead that Dr. Drugge intended to cause injury to Canfield. *See Woods Corp. Assocs. v. Signet Star Holdings, Inc.*, 910 F. Supp. 1019, 1032 (D.N.J. 1995) ("[A] plaintiff seeking to recover for tortious interference [is required] to show that the defendant specifically intended to interfere with that particular plaintiff."). Therefore, Canfield has also failed to plausibly plead the necessary knowledge and intent, or malice element of tortious interference with respect to Dr. Drugge. Count II is dismissed without prejudice.[8]

---

[8] Plaintiff additionally asks this Court to take judicial notice of webpages attached to its opposition, arguing that they are necessary to properly understand references made by Dr. Drugge to the "International Skin Imaging Collaboration." Pl. Opp'n at 17. Defendant opposes this request.

Count Four – Commercial Disparagement

In Count Four, Plaintiff brings a common law claim for commercial disparagement. Compl. ¶¶ 46-51. Plaintiff alleges that Defendants' false allegations irreparably harmed "Canfield's reputation and current and prospective business relationships." *Id.* ¶ 51. Additionally, Plaintiff alleges that "Canfield has suffered a loss of goodwill and *may* suffer lost sales or loss of prospective contracts with customers," as a result of Defendants' actions. *Id.* (emphasis added).

Defendants argue that Canfield has not sufficiently pled special damages and therefore cannot sustain a claim of commercial disparagement. Def. Br. at 19-21. Plaintiff responds that allegations regarding a loss in sales are only required "where a plaintiff fails to identify specific customers who have been affected by the disparagement." Pl. Opp'n at 18. Plaintiff argues that since it has alleged that the commercial disparagement affected its relationships with specific customers, it has adequately pled this claim. *Id.* at 19.

In order to state claim for commercial disparagement, or trade libel,[9] a plaintiff must allege "(1) publication; (2) with malice; (3) of false allegations concerning his property, product or business, and (4) special damages, *i.e.* pecuniary harm." *Nahas v. Shore Med. Ctr.*, No. 13-6537, 2015 WL 3448021, at *12 (D.N.J. May 29, 2015). Special damages must be in the form of

---

Def. R.Br. at 4-5. The Court finds it premature to take judicial notice of a website at this stage of the proceedings. Evidence must be authenticated before it can be admitted, and at this stage, the Court does not have the information it needs to authenticate the website. *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) ("Anyone may purchase an internet address, and so, without proceeding to discovery or some other means of authentication, it is premature to assume that a webpage is owned by a company merely because its trade name appears in the uniform resource locator."). Thus, Plaintiff's request for judicial notice is denied without prejudice.

Moreover, such information is not properly considered in a motion to dismiss. There are no factual allegations in the Complaint concerning Dr. Drugge's knowledge of International Skin Imaging Collaboration or how that information relates to Plaintiff's claim.

[9] Commercial disparagement is also known as trade libel. *See Patel v. Soriano*, 369 N.J. Super. 192, 246 (App. Div. 2004).

pecuniary harm and must be pled with particularity. *See Intervet, Inc. v. Mileutis, Ltd.*, 2016 WL 740267, at *6 (D.N.J. Feb. 24, 2016). Particularity requires alleging either "loss of particular customers by name, or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Nahas*, 2015 WL 3448021, at *13.

Here, Plaintiff has not sufficiently pled special damages, either through lost sales from established or prospective customers or through a general diminution of business. Plaintiff provides no particular allegations regarding a diminution of its business nor does it provide any specific allegations concerning lost sales (or lost potential sales). The Complaint indicates that Plaintiff has two customers: MSK and PAH. The Complaint further alleges that the recipients of the June 18 Email, other than MSK, were prospective customers. As noted above, Plaintiff's allegation that it had contracted with MSK, without more, is insufficient to allege that Canfield lost any business or suffered damages. The Complaint suffers similar deficiencies as to PAH. Also, including potential customers on the June 18 Email does not support pecuniary damages as there is no indication that Canfield had an actual customer relationship with, or a reasonable basis to believe that it would have a customer relationship with, such persons or institutions. Plaintiff merely alleges in Count Four that, as a result of Defendants' actions, it "has suffered a loss of goodwill and *may* suffer lost sales or loss of prospective contracts with customers." *Id.* ¶ 51 (emphasis added). This conclusory allegation is not sufficient to plead special damages with particularity. *See Intervet*, 2016 WL 740267, at *6. Therefore, Plaintiff has failed to plausibly plead a claim for trade libel and Count Four is dismissed without prejudice.

Counts Three and Five – Unfair Competition

Count Three is a claim for unfair competition pursuant to Section 43(a) of the Lanham Act, Compl. ¶¶ 40-45, and Count Five is a common law claim for unfair competition. *Id.* ¶¶ 52-54. Plaintiff alleges that "Defendants have made objectively baseless, material false statements concerning Canfield's products in a commercial communication . . . in an effort to harm Canfield's business relationships with its customers." *Id.* ¶ 41.

The Lanham Act, in relevant part, provides that:

> (a) (1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which-

> ... (B) in *commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her ... goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added). In order to establish a violation of the Lanham Act, a plaintiff must allege:

> (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Educ. Impact, Inc. v. Danielson*, No. 14-937, 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015). "The test of unfair competition under New Jersey law is identical to the test for unfair competition under § 1125 of the Lanham Act." *Graco, Inc.*, 2009 WL 904010, at *27; *see also Birthright v. Birthright Inc.*, 827 F. Supp. 1114, 1141 (D.N.J. 1993) (holding that since "the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal

Lanham Act," the court did not have to undergo a separate analysis under New Jersey common law). Accordingly, the Court addresses both claims together.

Plaintiff appears to be arguing that Defendants made a false statement about Canfield's product, specifically, that it infringes on Defendants' product. The Court notes that Defendants do not argue, as they had earlier, that Plaintiff failed to plausibly plead that Dr. Drugge knew that Canfield was the competitor when he sent the June 18 Email. As a result, the Court will not consider this point in its analysis as to these counts. Instead, Defendants focus on whether the June 18 Email constituted commercial speech.[10]

A threshold inquiry in a Lanham Act or unfair competition claim "is determining if the statement was disseminated commercial advertising or promotion." *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4205476, at *31 (E.D. Pa. Sept. 19, 2012). Courts in this District and others use a four-prong test[11] to determine what is considered "commercial advertising or promotion." *See, e.g.*, *Educ. Impact, Inc.*, 2015 WL 381332, at *13; *Pactiv Corp. v. Perk-Up, Inc.*, No. 08-05072, 2009 WL 2568105, at *9 (D.N.J. Aug. 18, 2009). The four elements of a commercial advertisement or promotion are: "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public

---

[10] Defendants do argue that the June 18 Email does not mention Canfield or the Vectra WB360, Def. Br. at 24, but they do so only in the context of their commercial speech argument.

[11] The four-prong test was originally set out in *Gordon & Breach Science Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1537 (S.D.N.Y. 1994). The Third Circuit has not explicitly adopted this test, but an overwhelming majority of district courts throughout the country have. *See, e.g.*, *Educ. Impact, Inc. v. Danielson*, No. 14-937, 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015) (describing how "courts in this District and others" apply the four prong test from *Gordon & Breach*); *Futuristic Fences, Inc. v. Illusion Fence Corp.*, 558 F. Supp. 2d 1270, 1281-82 (S.D. Fla. 2008). Additionally, Plaintiff does not argue against its use. The Court will therefore follow the other courts in this District and apply the *Gordon & Breach* four-part test.

to constitute advertising or promotion within the industry." *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1537 (S.D.N.Y. 1994).

Here, Defendants argue that Canfield fails to adequately allege that Dr. Drugge's statements in the June 18 Email satisfy the first and third elements. Def. Br. at 21-25. Additionally, Defendants contend that in respect to the July 15 Letters, Canfield fails to allege elements one, three, and four. *Id.* at 26-30. Plaintiff responds that Defendants' definition of "commercial speech" is too narrow. Pl. Opp'n at 20-22. Plaintiff argues that a broader interpretation is required and that its Complaint sufficiently alleges that the June 18 Email and the July 15 PAH Letter are commercial speech. *Id.* at 22-24. Additionally, Plaintiff contends that both the email and the letter are for the purpose of influencing customers to buy Dr. Drugge's device, and that each is disseminated sufficiently as required by the Lanham Act. *Id.* at 23-26.

As to the first element, "[c]ommercial speech is 'speech which does no more than propose a commercial transaction.'" *Pactiv Corp.*, 2009 WL 2568105, at *9 (quoting *Gordon & Breach Sci. Publishers*, 859 F. Supp. at 1537). At a bare minimum, commercial speech must "target a class or category of purchasers or potential purchasers, not merely particular individuals." *Mycone Dental Supply Co. v. Creative Nail Design, Inc.*, No. 11-4380, 2012 WL 3599368, at *6 (D.N.J. Aug. 17, 2012). Yet, a more expansive view has defined commercial speech as "an 'expression related solely to the economic interest of the speaker and its audience.'" *Refundo, LLC v. Drake Enters., Ltd.*, No. 13-643, 2013 WL 1750016, at *4 (D.N.J. Apr. 22, 2013) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993)).

"To decide whether speech is commercial, a court must determine (1) if it is an advertisement, (2) if it refers to a specific product or service, and (3) if the speaker has an economic motivation for the speech." *Pactiv Corp.*, 2009 WL 2568105, at *9 (citing *U.S. Healthcare v.*

*Blue Cross of Gr. Phila.*, 898 F.2d 914, 933 (3d Cir. 1990)). An "affirmative answer" to all three questions "provides strong support for the determination that the speech is commercial." *Id.* (internal quotation marks omitted). However, "it is not necessary that each of the characteristics 'be present in order for speech to be commercial.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 285 (4th Cir. 2013) (quoting *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 67 n.14 (1983)).

The July 15 PAH Letter is a notice and warning letter sent by Melanoscan's attorney concerning the potential infringement of his client's product. Courts agree that such letters, or cease and desist letters, are not commercial speech and thus cannot form the basis of an unfair competition claim. *See Futuristic Fences, Inc. v. Illusion Fence Corp.*, 558 F. Supp. 2d 1270, 1281-82 (S.D. Fla. 2008) (concluding that "a patent holder has the right to send cease and desist letters for the purpose of discontinuing allegedly infringing activity without subjecting the patentee to liability under the Lanham Act"); *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, No. 97-1568, 2007 WL 979854, at *16 (D.N.J. Mar. 30, 2007) (finding that "infringement notices" sent by defendant's attorney to plaintiff's customers warning them of plaintiff's potential infringement and directing them to discontinue the sale of plaintiff's product did not constitute "commercial advertising" under the Lanham Act); *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 710 (N.D. Ill. Oct.17, 2006) (ruling that cease and desist letters patent holder sent to alleged infringer's current and prospective customers were not "commercial advertising or promotion" within scope of Lanham Act's false or deceptive advertising provision).

The July 15 PAH Letter from Defendants' attorney is a warning and notice letter that (1) informed PAH of Canfield's alleged infringement; (2) *asked* PAH to refrain from obtaining any

further VETRA WB360 from Canfield;[12] and (3) informed PAH that "an entity that induces another to commit infringement of a U.S. patent may be held liable as an infringer." Def. Br. Ex. 4. The July 15 PAH Letter cannot form the basis of an unfair competition claim, and, as a result, the Court dismisses Counts Three and Five to the extent they rely on the letter.

However, Defendants' argument as to the June 18 Email comes up short. While the email is not an advertisement, it does refer to Melanoscan's product. *See Pactiv Corp.*, 2009 WL 2568105, at \*9. Additionally, Dr. Drugge touts his device as being "of enormous value in uncovering melanoma," which can reasonably be interpreted as satisfying the economic motivation requirement. *Id.* Since two of three elements for commercial speech have been met, and an advertisement is not required, the Court finds Plaintiff has plausibly pled that the June 18 Email is commercial speech when viewing the facts in a light most favorable to Plaintiff.[13]

Defendants also argue that Canfield has failed to allege that the June 18 Email was sent "for the purpose of influencing customers to buy defendant's goods or services." "Courts

---

[12] Plaintiff again mischaracterizes the content of this letter in its brief. Specifically, Plaintiff states that the letter "insists" that PAH refrain from obtaining any further VETRA WB360 devices from Canfield and "makes false and baseless threats" to "compel compliance with its demand." Pl. Opp'n at 24. In reality, the July 15 PAH Letter *asks* for PAH to refrain from obtaining any additional Canfield "VECTRA Whole body 360 'total body imaging' or like systems" pending the resolution of the infringement dispute. Def. Br. Ex. 4. Plaintiff's allegation that the July 15 PAH Letter demands that PAH stop using Canfield's product is, at best, erroneous. In addition, the Court cannot find any "false and baseless threats" in the letter. To be sure, the letter puts PAH on notice and warns the hospital of ramifications for improper conduct under the law, but the Court can find nothing false in the July 15 PAH Letter. Obviously, Canfield disagrees with the letter's statement that its product is infringing (hence, Count One in this suit) but that disagreement does not make the statement false. There is absolutely no evidence that Melanoscan believed that Canfield was *not* infringing but nevertheless sent the letter in bad faith.

[13] The Court is aware that the June 18 Email is not a typical commercial solicitation and that it addresses at length MSK's alleged intellectual property violation. However, at the motion to dismiss stage (and giving Canfield the benefit of all reasonable inferences), the Court cannot conclude as a matter of law that the email is not commercial speech at this time.

interpreting this element have been clear in requiring the involvement of a 'customer' or 'consumer' as those terms are generally understood." *Cancer Genetics, Inc. v. Hartmayer*, No. 07-5463, 2008 WL 323738, at *10 (D.N.J. Feb. 5, 2008). In the June 18 Email, Dr. Drugge touts his product, while stating that the MSK scanner is a "copycat." Dr. Drugge claims that his device has been "of enormous value in uncovering melanoma[.]" He further adds that "[t]ens of thousands of high risk melanoma patients have been scanned by the Melan[o]scan." This email was sent to at least one current customer of Canfield's – MSK. In addition, Dr. Drugge indicates that he is publicly serving notice on the "dermatology community." Given the recipient list, this statement can also reasonably be interpreted as having a purpose to influence the dermatological community to use the Melanoscan. Dr. Drugge touts his product, the tens of thousands of patients who have used it, and the product's efficacy. Again, viewing the facts in the light most beneficial to Plaintiff, the email could be read as encouraging its recipients to use the Melanoscan system instead of the allegedly infringing product. Thus, at this stage, the Court will deny Defendants' motion to dismiss Counts Three and Five as to the June 18 Email only.

## IV. CONCLUSION

In sum, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion. Defendants' motion is granted as to Counts Two and Four and those Counts are dismissed without prejudice. The motion is also granted as to the allegations concerning the July 15 Letters in Counts Three and Five and those allegations are likewise dismissed without prejudice. As to the June 18 Email allegations in Counts Three and Five, the motion is denied and Counts Three and Five shall remain with respect to the June 18 Email only. Plaintiff has thirty (30) days to file an amended

complaint, if it so chooses, and in accordance with Local Civil Rule 15.1.[14]  An appropriate Order accompanies this Opinion.

**Date:** May 25, 2017

JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE

---

[14] Effective May 10, 2017, Local Civil Rule 15.1 states, in part, that:

> A party who files an amended pleading in response to an Order authorizing the filing of that pleading to cure a defect in its pleading shall file:
>
> (1) a copy of the amended pleading, complete with a handwritten or electronic signature; and
> (2) a form of the amended pleading that shall indicate in what respect(s) it differs from the pleading that it amends, by bracketing or striking through materials to be deleted and underlining materials to be added.